UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

DAVID H. VANDENBOSCH and
ANNE M. VANDENBOSCH,

Case No: GG 03-14425
Chapter 7

    Debtors.

_____/

JEFF A. MOYER, Trustee,

    Plaintiff,

Adversary Proceeding
No. 05-81523

V.

RICHARD EDLUND and
EVANGELINE EDLUND,

    Defendants.

_____/

## OPINION REGARDING SPECIFIC PERFORMANCE OF LAND CONTRACT AND AVOIDANCE OF MORTGAGE

Appearances:

Andrew J. Gerdes, Esq., East Lansing, Michigan, and Mitchell J. Hall, Esq., Wyoming, Michigan, attorneys for Plaintiff, Jeff A. Moyer, Chapter 7 Trustee.

Edward A. Newmyer, Esq., Muskegon, Michigan, and Edward A. Grafton, Esq., Grand Haven, Michigan, attorneys for Defendants, Richard and Evangeline Edlund.

## I.  INTRODUCTION.

In 1998, Richard and Evangeline Edlund (the "Edlunds") sold property located at

2331 McCracken, Muskegon, Michigan (the "Property") to David and Anne Vandenbosch

(the "Debtors") on land contract.  After the Debtors filed their chapter 7 case in November

2003, Jeff A. Moyer ("Trustee"), the duly appointed trustee, filed this adversary proceeding

seeking specific performance of the land contract. The Trustee asserts that the Debtors satisfied their obligations under the land contract when they obtained a loan which paid off prior loans for which the Edlunds were the sole obligors. The Trustee also seeks avoidance and recovery of a mortgage on the Property that was purportedly granted by the Debtors to the Edlunds. The Trustee alleges that this mortgage contained an incorrect legal description of the Property and is therefore avoidable by the Trustee under 11 U.S.C. § 544.[1]

## II. JURISDICTION.

The court has subject matter jurisdiction over this bankruptcy case and this adversary proceeding. 28 U.S.C. § 1334. The case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D. Mich.). This adversary proceeding is a core proceeding because it involves administration of the estate, 28 U.S.C. § 157(b)(2)(A), and a determination of the validity, priority and extent of liens, 28 U.S.C. § 157(b)(2)(K). This opinion constitutes the court's findings of fact and conclusions of law. See FED. R. BANKR. P. 7052.

## III. FACTS.

In 1998, the Edlunds, longtime family friends of the Debtors, agreed to help the Debtors acquire a new home. To accomplish this, on September 3, 1998, the Edlunds

---

[1] In the alternative, the Trustee seeks to avoid the portion of that mortgage that secured a $20,000 home improvement loan from the Edlunds to the Debtors as a preferential transfer under 11 U.S.C. § 547. However, given the court's ruling on the first three counts of the Trustee's complaint, the court need not address this alternative request for relief.

purchased the Property for $87,900.  The Edlunds made a cash down payment of $10,300

for the Property, and obtained a loan for the balance of the purchase price, $77,600 ("Loan

1"), from Muskegon Commerce Bank (the "Bank").  To secure repayment of Loan 1, the

Edlunds granted the Bank a mortgage on the Property.  (Exh. 3.)  The Debtors' names did

not appear on the warranty deed received by the Edlunds.  The Debtors were not obligated

to the Bank under Loan 1 and their names are absent on the note or mortgage executed

in connection with the loan.

On the same day the Edlunds purchased the property, they sold the Property to the

Debtors on land contract for $88,369.  (Exh. 5.)  The Debtors paid $10,699 of the purchase

price in cash.  Pursuant to the terms of the land contract, the remainder of the purchase

price, $77,700, was to be paid by the Debtors in 60 monthly installment payments of

$625.60 each.  The balance of the purchase price was to be paid as a balloon payment

on September 3, 2003.  The land contract further provided:

> Upon full final payment of principal and interest of this Contract within the
> time and the manner required by this Contract, together with all other sums
> chargeable against the [Debtors], and upon full performance of the
> covenants and agreements of the [Debtors], the [Edlunds] shall convey the
> [Property] to the [Debtors] . . . by warranty deed . . . .

(Exh. 5.)  The land contract did *not* contain a future advance clause and was the only

written evidence presented at trial reflecting the agreement between the parties.  Although

the land contract specifically provided that it may only be amended by written agreement,

the contract was never modified in writing.  A Memorandum of Land Contract was recorded

on November 2, 1998.  (Exh. 6.)

Rather than making monthly payments to the Edlunds as contemplated under the

land contract, the Debtors made monthly payments directly to the Bank.  (Tr. 78-79; 109;

3

121.) The Bank applied the payments to reduce the amount owed by the Edlunds required by Loan 1.

On May 1, 2000, the Edlunds borrowed an additional $42,000 from the Bank to make improvements to the Property ("Loan 2"). To secure this loan, the Edlunds granted the Bank another mortgage on the Property. (Exh. 7.) Again, the Debtors were not indebted to the Bank under Loan 2 and their names did not appear on either the promissory note or mortgage. Regardless, the Debtors agreed to make payments on Loan 2 directly to the Bank. Although the land contract did not contain a future advance clause, David Vandenbosch testified that the parties had an oral agreement that the amount due under the land contract would increase if the Edlunds took out additional loans to improve the Property. (Tr. at 79.)

In March 2001, at the request of the Debtors, the Edlunds contacted the Bank to inquire about refinancing Loans 1 and 2 to reduce the monthly payments. Thereafter, on March 16, 2001, the Edlunds executed a new promissory note and mortgage in the amount of $129,405.83 ("Loan 3"). (Exh. 9.) This refinanced loan resulted in the discharge of the two prior mortgages that secured Loans 1 and 2. The Edlunds received no money from this transaction and, because the Debtors' names did not appear on the promissory note or mortgage, the Debtors again were not liable to the Bank for repayment of Loan 3. Regardless, the Debtors continued to make their monthly land contract payments directly to the Bank. The Bank applied these payments to reduce the amount owed by the Edlunds under Loan 3. There is no dispute that the parties, based upon their oral understanding, consistently treated the amount outstanding under the Edlunds' loans owed to the Bank as the remaining balance due under the land contract. (Tr. at 121.)

4

In August 2001, David Vandenbosch approached the Bank and requested that the Debtors be made the primary obligors on the debt secured by the Property. At trial, David Vandenbosch explained that he made this request because the Debtors had been paying on the Edlunds' loans for years. By becoming primarily liable on the debt, David Vandenbosch believed that he could absolve the Edlunds from their debt to the Bank while also establishing credit for himself. (Tr. at 80-81.) Accordingly, on August 8, 2001, the Debtors executed a Consumer Loan Agreement with the Bank in the amount of $135,342.41 ("Loan 4"). (Exh. 11.) Unlike the prior loans, the Debtors were the primary borrowers on Loan 4 and were directly responsible for making payments to the Bank. The Edlunds co-signed Loan 4. The loan agreement provided that Debtors, as borrowers, and the Edlunds, as co-signers, were "jointly and individually obligated to pay all amounts" required by Loan 4. (Exh. 11.)

In connection with Loan 4, the Debtors, the Bank, and the Edlunds executed a hypothecation agreement.[2] (Exh. 12.) Under the hypothecation agreement, the Edlunds assigned the Bank "all [their] right, title and interest to, and grant[ed] [the Bank] a security interest in the property described in" the "Mortgage, Deed of Trust, Trust Deed, or Security Deed" dated March 16, 2001, i.e., the mortgage executed by the Edlunds in connection with Loan 3.[3] (Exh. 12.)

---

[2] According to Black's Law Dictionary, "hypothecation" is "[t]he pledging of something as security without delivery of title or possession." Black's Law Dictionary (8th ed. 2004).

[3] The hypothecation agreement erroneously lists the Debtors as the lenders and the Bank as borrower. The parties acknowledge that this portion of the hypothecation agreement was drafted incorrectly.

5

At trial, both David Vandenbosch and Richard Edlund testified that Loan 4 paid off Loan 3 and satisfied the Edlunds' primary obligation owed to the Bank. (Tr. at 94 & 124.) Richard Edlund also testified that he believed Loan 4 fully paid off the remaining balance on the land contract. (Tr. at 111-12.) However, David Vandenbosch testified that he did not believe that Loan 4 paid off the land contract. (Tr. at 81.) He believed that Loan 4 simply made the Debtors the primary borrowers so they could establish credit. (Tr. at 81.) Because the Edlunds had co-signed Loan 4, David Vandenbosch also understood that the Edlunds would be liable for the loan if the Debtors defaulted. (Tr. at 82.) Regardless of the parties' subjective beliefs about the effect of Loan 4 on the underlying land contract, the land contract was never discharged or recorded as satisfied with the Register of Deeds. It is also undisputed that the Edlunds did not convey legal title to the Debtors at this time.

On October 11, 2002, the Debtors refinanced their loan with the Bank by executing a new loan agreement in the amount of $135,389.37 ("Loan 5"). (Exh. 17.) In the loan documents executed for Loan 5, the Debtors again signed as borrowers and Richard Edlund again signed as a co-signor. According to the loan agreement, the collateral for Loan 5 was a real estate mortgage on the Property dated August 8, 2001. No such mortgage has ever been produced or documented, and this purported mortgage was never recorded with the Register of Deeds.

On October 3, 2003, the Bank filed a state court complaint against the Debtors and the Edlunds based on the Debtors' alleged default on a car loan they had obtained from the Bank. (Exh. D.) David Vandenbosch explained that a provision in the car loan documents allowed the Bank to accelerate any and all of the Debtors' loans with the Bank

6

upon the Debtors' default under any of the loans.  Accordingly, the Bank accelerated Loan 5 and included it in the state court action.

In November 2003, the Edlunds paid $135,000 to the Bank to settle the state court action.  The Debtors then executed a promissory note in the amount of $155,000 in favor of the Edlunds ("Loan 6").  (Exh. 21.)  The promissory note included the Debtors' obligation to repay the Edlunds $135,000 for the state court settlement, and an additional $20,000 the Edlunds had expended between November 2002 and November 2003 to improve the Property.  As collateral for Loan 6, the Debtors intended to grant the Edlunds a mortgage on the Property.  The parties executed a mortgage and recorded it on November 12, 2003.  (Exh. 22.)  However, the mortgage contained an erroneous legal description of the Property and, as a result, did not encumber the Property.  Instead, the mortgage covered a vacant lot adjacent to the Property.[4]

The Debtors filed their chapter 7 bankruptcy case on November 28, 2003, and the Trustee initiated this adversary proceeding against the Edlunds on November 28, 2005.  After a number of attempts to settle the dispute, and after the conclusion of a two day trial, held on March 18, 2008 and August 4, 2008, the court took the adversary proceeding under advisement.

---

[4] Although the mortgage did not include a street address, the vacant lot described in the mortgage was located at 2321 McCracken, Muskegon, Michigan.  The Debtors had previously owned this property.  However, for reasons unknown to the court, the Debtors conveyed the vacant lot to Attorney Edward A. Newmyer by a warranty deed twenty days before granting the mortgage to the Edlunds.

## IV. ISSUES.

The main issues presented are: (1) whether the Debtors fulfilled their obligations under the land contract when they obtained Loan 4 and its proceeds were used to satisfy the Edlunds' indebtedness to the Bank under Loan 3, thereby entitling the Debtors to specific performance of the land contract, and (2) assuming the mortgage is valid, whether the Trustee may avoid the mortgage granted by the Debtors to the Edlunds to secure Loan 6 because it contains an erroneous legal description.

## V. DISCUSSION.

### A. Specific Performance of the Land Contract.

The first two counts of the Trustee's complaint seek specific performance of the land contract between the Debtors and the Edlunds. The Trustee requests this relief based on the assertion that the Debtors fully satisfied their obligations under the land contract when they obtained Loan 4.

Under Michigan law, the execution of a land contract triggers application of the doctrine of equitable conversion. See John G. Cameron, Jr., Michigan Real Property Law, § 16.3 (3d ed. 2005) (citing Charter Twp. of Pittsfield v. Saline, 302 N.W.2d 608 (Mich. App. 1981)). Equitable title to the real estate passes to the vendee or purchaser, while legal title remains in the vendor or seller as security for the payment of the purchase price. See Barker v. Klingler, 4 N.W.2d 596, 599 (Mich. 1942) (discussing equitable conversion in context of an ejectment action); Hooper v. Van Husen, 63 N.W. 522, 523 (Mich. 1895). Accordingly, Michigan courts have described the land contract vendee "as the owner subject to liability for the unpaid price and the vendor as holding the legal title *in trust* for

8

him from the time a valid agreement for the purchase of land is entered into." Charter Twp. of Pittsfield, 302 N.W.2d at 609 (emphasis supplied) (citation omitted). "[A]s a vendee makes payments on a land contract the vendor becomes trustee for him of the legal estate, and he becomes in equity the owner of the land to the extent of payments made." Id. at 610.

When the vendee pays the purchase price in full, the vendee becomes entitled to a conveyance of legal title. Barker, 4 N.W.2d at 599; Hooper, 63 N.W. at 523; see also Steward v. Panek, 652 N.W.2d 232, 238 (Mich. App. 2002) ("[A] buyer who performs under a land contract (i.e., pays in full) acquires equitable title, and the vendor holds the legal title to the property in trust."); Haight v. Salter, 244 N.W. 209, 210 (Mich. 1932) ("If the conveyance is to be made upon payment the purchaser is entitled to a conveyance as soon as the purchase-price is paid or tendered, or in case of payment in instalments upon payment or tender of the last instalment."). This common law rule is codified in the Michigan land contract statutes, which provide in relevant part:

> When the vendee named in a land contract . . . has fully paid and performed the obligations under the contract that are a precondition to the sale and conveyance of the land, the vendor named in the contract shall make conveyance of the land to the vendee by a deed of conveyance as specified in the land contract . . . . Until the vendor named in the contract has ceased in law to be bound by the provisions of the contract, the obligation to convey the land remains a continuing executory obligation on the part of the vendor.

Mich. Comp. Laws Ann. § 565.361(1).

Applying these principles to the facts of this case, the primary question is whether the Debtors fully performed their obligations under the land contract when they obtained Loan 4, thereby entitling them to legal title to the Property. The court finds that the Debtors fulfilled their obligations under the land contract when the proceeds of Loan 4 were applied

9

to satisfy the Edlunds' indebtedness under Loan 3 and, at that moment, the Debtors became entitled to a conveyance of legal title.

Initially, the Debtors' payments under the land contract were identical to the amounts owed by the Edlunds to the Bank under Loan 1. When the Edlunds obtained Loan 2 to finance an addition to the Property, this amount was added to the land contract balance by an oral agreement between the Edlunds and the Debtors. The Debtors continued to pay the amounts due under Loans 1 and 2 directly to the Bank as their monthly land contract payment until the loans were refinanced and consolidated into Loan 3. After the Edlunds obtained Loan 3, the Debtors again continued to make all payments on the Edlunds' loan directly to the Bank. Based upon these uncontested circumstances, and by the Edlunds' own admission, it is evident that the Debtors and the Edlunds consistently treated the balance due under the Edlunds' loans from the Bank as the balance due under the land contract.

The legal posture of the transaction changed dramatically, however, when the Debtors obtained Loan 4. Unlike the previous loan transactions with the Bank, the Debtors, not the Edlunds, were the primary obligors under Loan 4. The testimony and documents in evidence establish that the proceeds from Loan 4, approximately $135,000, were used to pay the Edlunds' entire liability to the Bank under Loan 3. This amount also satisfied the full balance due under the land contract. The land contract states that the Edlunds "*shall convey*" the Property to the Debtors "[u]pon full final payment of principal and interest . . . together with all other sums chargeable against the [Debtors], and upon full performance of the covenants and agreements of the [Debtors]." (Exh. 5.) (Emphasis added.) Accordingly, under the express terms of the land contract, and consistent with

10

Michigan law, the Debtors were entitled to a conveyance of legal title to the Property when the proceeds of Loan 4 were used to pay off Loan 3.[5]

As the Edlunds correctly argue, Loan 4 did not completely absolve them of potential liability to the Bank.  As co-signers of the loan, they were jointly and severally liable for the amounts due from the Debtors to the Bank and the Bank could seek repayment of Loan 4 from the Edlunds without first demanding payment from the Debtors.  If the Edlunds were required to pay the Bank under Loan 4 (as they ultimately were), they would likely be entitled to reimbursement from the Debtors.  But any such rights against the Debtors would arise by virtue of the Edlunds' status as co-signers of the loan, *not as land contract vendors*.  Accordingly, the court finds that the Debtors fully performed their obligations under the land contract when they obtained Loan 4 which completely satisfied the Edlunds' prior liability to the Bank under Loan 3.

Although Richard Edlund testified that he believed Loan 4 satisfied the Debtors' remaining obligations under the land contract, it is undisputed that the Edlunds failed to transfer legal title to the Debtors at that time.  This failure gives rise to the second question in this case:  that is, what rights does a land contract vendee have when the vendor fails to timely transfer legal title?

The general answer to this question is relatively straightforward.  Michigan law provides that "if a vendor fails to transfer title when promised . . . he or she has committed

---

[5] The original relationship between the Debtors and the Edlunds was linear.  The Edlunds were obligated to pay the Bank and they permitted the Debtors to make direct payments which partially satisfied both the Edlunds' bank loan and the Debtors' land contract obligations.  After restructuring under Loan 4, the relationship was tri-party.  The Debtors directly owed the Bank and the Edlunds were only liable as co-debtors.

a material breach entitling the vendee to sue for specific performance . . . ." Terrell v. Albaugh (In re Terrell), 892 F.2d 469, 472 (6th Cir. 1989) (applying Michigan law and holding that a Michigan land contract was an "executory contract" under § 365 of the Bankruptcy Code). However, this court has been unable to locate any Michigan law which squarely holds that a judgment of specific performance relates back to the time when legal title should have been conveyed under the land contract. Notwithstanding, the court concludes that several related principles mandate this legal result. See Vogel v. Kalita (In re Kalita), 202 B.R. 889, 901 (Bankr. W.D. Mich. 1996) (when "the state's highest court has not decided the applicable law . . . the federal court must ascertain the state law" from other sources, including "the majority rule among other states") (quoting Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126, 1130 (6th Cir. 1995)).

In analyzing this issue, the court has considered whether any occurrence or action of the vendor could interfere with a purchaser's right to compel conveyance of the legal title after all payments have been made under a land contract. For example, could a judgment creditor cause a lien to attach to the vendor's interest under the contract at this time? Based on a review of relevant case law from Michigan and other jurisdictions, the court concludes that it could not.

The general rule is that a judgment lien "attaches to the precise interest or estate which the judgment-debtor [in this context, the vendor] has, actually and effectively, in the land." 1 Henry Campbell Black, A Treatise on the Law of Judgments § 420 (1891). Therefore, a lien against a vendor "cannot of itself operate to change the quantity of [the vendor's] interest" nor can it "bind or convey any greater or other estate than the [vendor]

12

himself, in the exercise of his rights, could voluntarily have transferred or alienated." Id. Although this is older authority, it remains legally correct today.

Using the oft-cited comparison of real property interests to a "bundle of sticks," the vendor's interest under a land contract consists of two "sticks" during the executory period: "the right to receive contract payments" and "the legal title in the property, which secures the purchaser's obligation to make the contract payments, with the 'concomitant possibility of resuming general ownership of the land upon default.'" Bedortha v. Sunridge Land Co., 822 P.2d 694, 696 (Or. 1991). There is a split of authority as to whether these "sticks" constitute an interest in real property and, consquently, whether a judgment lien may attach to this interest before all payments are made under the land contract. See generally William B. Stoebuck & Dale A. Whitman, The Law of Property § 10.13 (3d ed. 2000).[6] This

---

[6] A slight majority of jurisdictions hold that the "sticks" retained by the vendor under a land contract constitute a real property interest to which a judgment lien may attach. Compare Bedortha, 822 P.2d at 698 ("a judgment lien under [Oregon law] attaches both to the vendor's right to receive contract payments and to the vendor's legal title in the real property;" although these property interests may be severed under some circumstances, they generally "go hand in hand"); Monroe v. Lincoln City Employees Credit Union, 279 N.W.2d 866, 868 (Neb. 1979) ("where a judgment is recovered . . . against a vendor who has sold certain real estate in the same county but has not made a deed therefor nor received the whole of the purchase money, such judgment is a lien on the vendor's interest in the land"); First Security Bank of Idaho, N.A. v. Rogers, 429 P.2d 386 (Idaho 1967) (adopting "majority rule" that a judgment lien against a vendor after a land contract is executed but before delivery of the deed to the purchaser "extends to all of the vendor's interest remaining in the land and binds the land to the extent of the unpaid purchase price"); with Cannefax v. Clement, 818 P.2d 546, 550 (Utah 1991) (A "vendor's interest in property subject to an executory real estate contract is not real property . . . and, therefore, the judgment creditor's lien [does] not attach to the vendor's interest."); Goodman v. Smith, 281 P.2d 1094,1097 (Kan. 1955) ("[I]t is generally held and is followed in Kansas that a judgment and execution against the owner of the bare legal title is not a valid lien on the realty where the equitable title has been previously vested in another.").

13

court has not found any decision in which the Michigan Supreme Court has ruled directly on this issue.[7]

However, once all payments under the contract have been made, and all that is left for the vendor to do under the contract is to convey legal title to the purchaser, any rationale for permitting a lien to attach to the vendor's interest no longer exists.  Upon receipt of the final payment under the contract, the only "stick" still held by the vendor is bare legal title and, as described by the Michigan case law, even that stick is held "in trust" for the vendee until it is conveyed.  Cf. Fowler v. Cornwell, 43 N.W.2d 73, 77 (Mich. 1950) (land contract vendee entitled to quiet title as against purported purchasers of land from heirs of land contract vendor; because the land contract was paid in full, "defendant's grantors held at most only a bare legal title, and that in trust for the vendee . . . . Defendant, who purchased with notice of the [land contract vendee's] equitable rights, acquired no better title than held by his grantors.").  If legal title is not promptly conveyed, and a suit for specific performance is required to compel the vendor to comply with his

---

[7] The only Michigan case the court was able to locate, Doak v. Runyan, 33 Mich. 75, 1875 WL 3726 (1875), involved unusual facts but appears to follow the majority approach. In that case, Runyan transferred property to his wife several days before execution was levied on the land by his judgment creditor.  Runyan and his wife claimed that they had previously entered into a contract for the sale of the land, and that the deed was given pursuant to that contract.  Even assuming the facts presented by the Runyans to be true, the Michigan Supreme Court noted that Mrs. Runyan owed more than half the balance under the purported land contract at the time the property was deeded to her.  Under these circumstances, the court stated:

> [Mr. Runyan] had no right to give away, as against his creditors, any title which he possessed . . . . [H]e owned . . . title subject at best to an executory contract less than half performed.  A levy upon his interest would take the legal title in full and a beneficiary interest subject to the liability of conveying on complete performance by Mrs. Runyan.

Id. at *2. Accordingly, the court held that the judgment creditor was "entitled to have the deed set aside, and to have the land sold to satisfy his judgment." Id.

14

obligation under the land contract, this court firmly believes that any judgment compelling specific performance must relate back to the time at which legal title should have been transferred.

The general nature of specific performance also supports this conclusion. It is axiomatic that specific performance is an equitable remedy, the purpose of which is to put the parties "as nearly as possible in the position that they would have occupied had the conveyance of the real property occurred *when* required by the contract." Godwin v. Lindbert, 300 N.W.2d 514, 515 (Mich. App. 1980) (emphasis supplied) (upholding trial court's award of supplemental damages in action for specific performance of contract for sale of real estate; damages represented difference between mortgage interest rate obtained by purchasers when contract was executed and the interest rate available at time specific performance was awarded); see also Charter Twp. of Pittsfield, 302 N.W.2d at 609-10 (equitable conversion is "based on the maxim that 'equity regards and treats as done what, in good conscience ought to be done'") (citations omitted); 2 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 364 (5th ed. 1941) (The first maxim of equity jurisprudence is: "[e]quity regards and treats that as done which in good conscience ought to be done."). This purpose would be negated if the judgment of specific performance did not relate back to the time when legal title should have been conveyed.

For these reasons, the court holds that the Debtors were entitled to specific performance of the land contract when they obtained Loan 4 and its proceeds were used to completely satisfy Loan 3. Although legal title was not conveyed at that time, the Debtors' right to compel specific performance of the land contract became property of their bankruptcy estate upon the filing of their chapter 7 case. See 11 U.S.C. § 541(a). That

15

right may now be properly exercised retroactively by the Trustee. Therefore, the Trustee is entitled to specific performance of the land contract and the Edlunds shall be required to execute a warranty deed transferring title of the Property to the Trustee.[8]

B. *Avoidance of the Mortgage.*

In count three of the complaint, the Trustee seeks to utilize his "strong arm" powers under § 544(a)(3) of the Bankruptcy Code to avoid the mortgage granted by the Debtors to the Edlunds in connection with Loan 6. The Trustee asserts that the mortgage is avoidable because it contains an incorrect legal description of the Property.

Under § 544(a)(3) of the Bankruptcy Code, a trustee "may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . . a bona fide purchaser . . . ." 11 U.S.C. § 544(a)(3); see Simon v. Chase Manhattan Bank (In re Zaptocky), 250 F.3d 1020, 1024 (6th Cir. 2001) (A trustee "is entitled to avoid [a] mortgage under section 544(a)(3) if a hypothetical bona fide purchaser would be able to avoid [the] mortgage."). The question of "[w]ho may qualify as a bona fide purchaser of real property is determined under state law." Select Portfolio Servs., Inc. v. Burden (In re Trujillo), 378 B.R. 526, 531-32 (Bankr. 6th Cir. 2007) (citing Owen-Ames-Kimball Co. v. Mich. Lithographing Co. (In re Mich. Lithographing Co.), 997 F.2d 1158, 1159 (6th Cir. 1993)).

---

[8] If no deed is promptly delivered, this court's attendant order shall be in recordable form.

16

In Michigan, a properly recorded mortgage provides a bona fide purchaser of real property with constructive notice of the prior interest in the property.[9]  However, in this case, it is undisputed that the mortgage granted by the Debtors in connection with Loan 6 describes the vacant lot adjacent to the property, rather than the Property itself. Therefore, the recorded mortgage on the wrong property does not provide a bona fide purchaser with constructive notice of the Edlunds' interest in the Property and the mortgage, to the extent it may be valid, is avoidable by the Trustee under § 544(a)(3). See, e.g., Barnard v. Campau, 29 Mich. 162, 1874 WL 6249, *1 (1874) (Noting that the recording acts are not subject to "equitable construction . . . by means of which they may be made to give constructive notice of things the records do not show;" if a mistake is made in the recorded instrument, "by means of which a mortgage appears to be for a less sum than it was in fact given for, or a deed to cover less than was embraced by it, a subsequent purchaser has a right to rely on the record as showing the exact facts.") (citations omitted).

The Edlunds concede that the mortgage was recorded against the wrong real property.  They argue, however, that the Memorandum of Land Contract and the Bank's

---

[9] The Michigan recording acts provide that a properly record mortgage "shall be notice to all persons . . . of the liens, rights, and interests acquired by or involved in the proceedings. All subsequent owners or encumbrances shall take subject to the perfected liens, rights, or interests."   Mich. Comp. Laws Ann. § 565.25(4).  Accordingly, "[t]he recordation of a mortgage constitutes constructive notice . . . regarding both the existence of the mortgage and the amount of indebtedness that is secured." Ameriquest Mortgage Co. v. Alton, 731 N.W.2d 99, 105 (Mich. App. 2006) (citing McMurtry v. Smith, 30 N.W.2d 880 (Mich. 1948)).  The recorded mortgage "is notice to all subsequent purchasers that they take subject to any lien the mortgagor may have on the property whether the record has been examined or not." Id. (citing Piech v. Beaty, 299 N.W. 705 (1941)).

17

mortgage were both properly recorded against the Property and that the discovery of these documents in the chain of title would have put the Trustee on inquiry notice of the Edlunds' defective mortgage. This argument is fatally flawed. The Memorandum of Land Contract and the Bank's mortgage both contained the correct legal description of the Property. However, no amount of inquiry into the Property's chain of title would have revealed the Edlunds' mortgage, because the Edlunds' mortgage had a different legal description. The existence of the recorded land contract and earlier mortgage does not defeat the Trustee's right to avoid the Edlunds' mortgage as a bona fide purchaser without notice. The court holds that, to the extent it may be valid against the Property,[10] the Trustee may avoid the mortgage. 11 U.S.C. § 544(a)(3). Upon avoidance, the mortgage, to the extent it may be valid, is automatically preserved for the benefit of the estate. 11 U.S.C. § 551.

*C. Asserted Reformation Remedy.*

The Edlunds further argue that the inclusion of the incorrect legal description in the mortgage was a mutual mistake that is subject to reformation by this court. Michigan law permits a "court in equity" to "reform an instrument, including a mortgage, to include property that had been omitted by the mutual mistake of both the grantor and the grantee."

---

[10] Alternatively, the mortgage recorded against the vacant lot is invalid against the Property. What effect the vacant lot mortgage may have upon the Edlunds and their attorney, Newmyer, is not before this court. Indeed, if presented, the court would question its possible jurisdiction to decide this issue, which involves non-debtor parties. 28 U.S.C. § 1334; Sanders Confectionery Prods., Inc. v. Heller Finan. Inc., 973 F.2d 474, 483 (6th Cir. 1992) ("Generally, bankruptcy jurisdiction does not extend to actions between third parties because the action would not be 'related to' a bankruptcy proceeding."); Gardner v. United States (In re Gardner), 913 F.2d 1515, 1518 (10th Cir. 1990) ("[T]he bankruptcy court lacks related jurisdiction to resolve controversies between third party creditors which do not involve the debtor or his property unless the court cannot complete administrative duties without resolving the controversy.") (citing In re Shirley Duke Assocs., 611 F.2d 15, 18 (2d Cir. 1979)).

See Olson v. Aegis Mortgage Corp. (In re Bloxsom), 389 B.R. 52, 57 (Bankr. W.D. Mich. 2008) (citing Kowatch v. Darnell, 92 N.W.2d 342, 343 (Mich. 1958) (additional citations omitted)). "However, reformation is not available if the subject property has been acquired by a bona fide purchaser for value and without notice." Id. The Supreme Court of Michigan has stated:

> It is too well settled to need citation of authority that no reformation of a deed can be made affecting the property after it has gone into the hands of a bona fide purchaser for value without notice. Dart v. Barbour, 32 Mich. 267; Toll v. Davenport, 74 Mich. 386-397, 42 N.W. 63; Culbertson v. Witbeck Co., 92 Mich. 469, 52 N.W. 993. A bona fide innocent purchaser for value and without notice is the peculiar favorite of a court of equity, and the authorities unite on the proposition that a mistake in a written instrument will not be corrected against such a party. 34 Cyc. 956, 957, and cases cited.

Robertson v. Smith, 158 N.W. 207, 209 (Mich. 1916).

Under § 544(a)(3) of the Bankruptcy Code, the Trustee acquired the "rights and powers" of a bona fide purchaser and those rights were fixed "as of the commencement of the [Debtors' bankruptcy] case." 11 U.S.C. § 544(a)(3); cf. In re Trujillo, 378 B.R. at 537 (declining to apply amendments to Kentucky recording statute retroactively in contravention of trustee's rights which vested at the commencement of the bankruptcy case). Accordingly, the Trustee's rights intervened as of the filing of the bankruptcy case and the mortgage may no longer be reformed. See, e.g., Chase Manhattan Bank, N.A. v. Edmondson (In re Cunningham), 48 B.R. 509, 512 (Bankr. M.D. Tenn. 1985) (applying Tennessee law, which follows the "general rule" that a deed may not be reformed "where third parties have acquired an interest in real property omitted from [the] deed without notice of the original grantee's adverse claim" and holding that a deed may not be

19

reformed after the trustee's rights have intervened). The court holds that the requested reformation remedy is not available to the Edlunds.

## VI. CONCLUSION.

The court realizes that, from the Edlunds' perspective, the result in this case appears unfair and harsh. It is apparent to the court that after executing the original land contract, and throughout the various loan transactions, the Edlunds have proceeded with the genuine intention of giving meaningful economic assistance to the Debtors. Unfortunately for the Edlunds, two key occurrences in this case have led to inescapable legal consequences. First, with regard to the land contract, the Edlunds and the Debtors chose to obtain Loan 4 without consulting an attorney. Although the parties understood that Loan 4 paid off Loan 3 and satisfied the Edlunds' direct debt to the Bank, and Richard Edlund admitted at trial that Loan 4 also paid off the land contract, they likely did not recognize the legal implications of their actions at the time Loan 4 was obtained. Notwithstanding, the effect of Loan 4 under Michigan law was to fully pay the remaining balance on the land contract. Second, the Edlunds' attorney's mistake in including the incorrect legal description in the mortgage, while also unfortunate for the Edlunds, entitles the Trustee to avoid the mortgage, to the extent it may be valid, under the Bankruptcy Code or renders the intended mortgage nugatory as to the Property. The court is not unconstrained to disregard the dictates of Michigan law and the Bankruptcy Code in order to fashion a result that is more "fair" to the Edlunds. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S. Ct. 963, 969 (1988) (The bankruptcy court's equitable powers may "only be exercised within the confines of the Bankruptcy Code."); Gen. Elec.

20

<u>Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.)</u>, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992) (As a court of equity, the bankruptcy court "may not arbitrarily make rulings based on whatever it deems is fair – rather this court must be *just*.") (emphasis in original).[11]

For the foregoing reasons, the court concludes that the Trustee is entitled to specific performance of the land contract and to avoid the mortgage, to the extent it may be valid, on the Property executed in connection with Loan 6. This will permit the Trustee to administer the Property.[12] A separate order shall be entered accordingly.

Dated this 30th day of April, 2009
at Grand Rapids, Michigan

Honorable James D. Gregg
Chief United States Bankruptcy Judge

---

[11] *If*, and this is a big "*if*," the land contract contained a subsequent advance clause or *if* the Debtors had granted a valid and non-avoidable mortgage on the property to secure repayment by the Debtors of the indirect obligation to the Edlunds of Loan 4, the court's analysis would be different. However, what could have been or should have been is not always what it is.

[12] To the extent the Edlunds have, or shall have, a valid claim, it will be treated as unsecured.